# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| REWIS A. MORRIS, ) | Civil Action No.: 2:24-cv-03880-DCN-MHC |
| ) | |
| Plaintiff, ) | **COMPLAINT** |
| ) | **Violation of the ADEA** |
| vs. ) | **(Termination) and Retaliation** |
| ) | |
| CACI, INC. – FEDERAL, ) | |
| ) | |
| Defendant. ) | **JURY TRIAL DEMANDED** |
| ) | |

The plaintiff, complaining of the acts of the defendant, alleges as follows:

1. That the plaintiff is a citizen and resident of the County of Charleston, State of South Carolina.

2. That, upon information and belief, the defendant CACI, Inc. – Federal ("CACI" or "defendant") is a foreign corporation doing business and maintaining offices and agents in the County of Charleston, State of South Carolina.

3. That this court has federal question jurisdiction of the above-styled action pursuant to 29 U.S.C. § 623, et seq. (the Age Discrimination in Employment Act or "ADEA") and 28 U.S.C. § 1331.

4. That venue for all causes of action stated herein lies in the District of South Carolina, Charleston Division, as defendant does business in said district, plaintiff resides in the district, and a substantial portion of the facts giving rise to plaintiff's claims occurred in the said district.

1

**CONDITIONS PRECEDENT**

5.   That plaintiff has exhausted all administrative remedies and conditions precedent, including timeliness, deferral and all other jurisdictional requirements necessary for the maintenance of the foregoing action, all of which are more fully described below.

6.   That at all relevant times as defined by the ADEA, defendant employed twenty (20) or more employees as required by the ADEA.  As such, the defendant is an "employer" as defined by the ADEA and is otherwise subject to and covered by said Act.

7.   That on or about October 31, 2023, and as a result of defendant's discriminatory conduct, all of which is more fully described below, plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination and retaliation based on age.

8.   That on or about April 19, 2024 plaintiff received a Notice of Right to Sue from the EEOC regarding the Charge of Discrimination described in Paragraph 7 above.

9.   That plaintiff has timely filed the foregoing action within ninety (90) days of the date on which he received the Notice of Right to Sue described above in Paragraph 8.

**FACTUAL ALLEGATIONS**

10.   That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 9 hereinabove as fully as if set forth verbatim.

11.   That plaintiff was born in 1971 and, thus, was over forty (40) years of age during the time of the discrimination alleged herein.

10.   That on or about April 23, 2014 plaintiff was hired by the defendant as a Project Manager Deputy Intel.  In or around late 2019 (after a couple of promotions and title changes) defendant promoted plaintiff into a Project Manager L3 position.  The position was a

supervisory one where plaintiff was assigned to work at defendant's North Charleston, South Carolina location (but with the ability to also work remotely from his home in Mt. Pleasant, South Carolina).

11. That as a supervisor, plaintiff had the authority to hire, discipline and fire employees under him in the chain of command.

12. That as a Project Manager L3 plaintiff was in charge of two (2) important projects at defendant: CIRRAS and SMDS.

13. That as to plaintiff's chain of command, plaintiff had three (3) managers reporting directly to him: Philip Middleton ("Middleton") (approximately 34 years of age) who supervised approximately eight (8) or nine (9) Help Desk employees such as Requirement Analysts and Software Testers; Justin Martin ("Martin") (approximately 37 years of age) who supervised approximately eight (8) Performance Assurance Analysts and System Administrators; and Napel Niresh "Max" Khadge ("Khadge") (approximately 34 years of age) who supervised about eleven (11) Software Developers.

14. That going up the chain of command, as Project Manager L3 plaintiff reported directly to Kimberly Kryzda ("Kryzda"), a female Executive Director who, upon information and belief, was around 46 years of age at the time and who worked remotely from her home in Norfolk, Virginia. Kryzda, in turn, reported to Grant Demola ("Demola") (approximately late 30's/early 40's), the Vice-President of the company who worked out of McLean, Virginia. Demola reported to James "Jimmy" Norcross ("Norcross") (estimated to be in his 50's), the Vice-President of Supply Chain Solutions who worked out of Chantilly, Virginia and Norcross reported to DeEtte Gray ("Gray") (approximately 49 years old), the President of

Business and Information Technology Solutions who worked out of Bethesda, Maryland. Gray reported to the CEO of the company.

15. That other than the above, and though outside of plaintiff's chain of command, towards the end of plaintiff's employment at defendant plaintiff had dealings with Kelly Ann Anderson ("Anderson") (approximately 40 years of age), defendant's Senior Human Resource Director out of Reston, Virginia.

16. That as to performance, plaintiff performed his job duties at defendant in an above-satisfactory fashion and otherwise maintained an excellent employment record there. In this regard, plaintiff was never disciplined the entire nine (9) years he worked at defendant; his supervisors routinely praised plaintiff for his satisfactory work performance; and plaintiff was always given top overall scores on the evaluations he received from the defendant. For example, as to plaintiff's performance evaluations, on a 2021/2022 Contractor Performance Assessment Report ("CPAR") plaintiff and his team were rated "exceptional" (the highest score there is) ***on all seven (7) evaluation areas*** and it was noted in the evaluation that plaintiff and his team "exceeded the Government's expectations." On a 2020/2021 CPAR plaintiff and his team were given an "exceptional" rating in three (3) evaluation areas and "very good" ratings (the next highest rating) in the remaining three (3) categories.

17. By further way of example, plaintiff's strong performance at defendant is evidenced by the fact that on DHRS plaintiff grew the CIRRAS project from roughly eight (8) employees to over fifty (50) billable positions, including the new SMDS; plaintiff and his team won many performance-related awards under plaintiff's guidance, including, but not limited to, the Department of Navy Excellence Award in IT, the NIWC Lightning Bolt Award, and a CACI

4

Team Innovation Award. To add to the above, plaintiff was also considered "key personnel" in the project recompete – which plaintiff's team won.

18. That at the same time, at the age of 51, plaintiff was one of the older employees at defendant's North Charleston, South Carolina location – a location where a majority of the employees were in their thirties and, thus, ten (10) to twenty (20) years younger than plaintiff. Almost all of plaintiff's subordinates were younger or substantially younger than plaintiff, and at least two (2) of plaintiff's supervisors were as well – Kryzda and Demola. Still, as the above indicates, plaintiff was an outstanding employee at defendant; he was very proficient at his job; plaintiff enjoyed his employment at defendant; and he planned to stay there until he retired. In general, plaintiff's career at defendant was successful and smooth.

19. That all that began to change in a slow fashion when, sometime in or around March of 2022, an outspoken female employee, Larissa Cribben ("Cribben"), a Software Developer working under Khadge, brought another female employee, Madeline Gollata ("Gollata"), who also worked under Khadge, into plaintiff's office so that Gollata could register a complaint against Khadge. It is not clear why Gollata needed Cribben to accompany her to plaintiff's office on that occasion. Nevertheless, plaintiff listened to her complaints and remedied the issue by moving Gollata to work under a different manager.

20. That next, on or about January 9, 2023, Khadge advised plaintiff that Cribben had announced she was leaving the company and that her last day of work would be January 31, 2023. Later that day, plaintiff saw Cribben and asked her if they could talk in his office. Once in plaintiff's office, plaintiff politely confirmed with Cribben that she in fact intended to leave the company and plaintiff asked Cribben why she was leaving CACI. In response, Cribben became defensive and asked if she was required to answer plaintiff's question.

Plaintiff responded, again in a polite manner, that she did not have to disclose that information to him.  Nevertheless, Cribben voluntarily told plaintiff that she did not like Khadge's management style and she was unhappy that Khadge had rejected her request to work remotely from her home.  Plaintiff then asked Cribben if there was anything else that she was not happy about or that she wanted to discuss.  Cribben responded in clear and unambiguous terms that there was not. Plaintiff then ended the meeting by advising Cribben that CACI appreciated her work and contributions to the company and further asked her if there was anything else he could do to keep her on board.  Cribben replied in the negative.  At no time during the meeting did Cribben raise any complaints against plaintiff.

    21. That matters became slightly worse when on or about January 11, 2023 Edward "Cole" Rabon ("Rabon") (age 37) a Help Desk employee who reported to Middleton, left his government-issued common access identification card ("CAC") on his laptop while he went to lunch that day.  While Rabon was at lunch, Gollata (the female employee referred to above) saw Rabon's CAC card and, as a joke, she took the card so that when Rabon returned from lunch he would wrongfully believe he had lost it.  To enhance the effect of the joke, Gollata told others in the office what she had done.  It just so happened that Rabon, who, upon information and belief, suffers from PTSD, was scheduled to assist with a presentation later that afternoon, an event that would require Rabon to have his CAC card.  Of course, when Rabon returned from lunch, he could not find his identification badge.  Given his planned presentation and the fact that Rabon would need his ID card to give it, the longer Rabon looked for his missing card, the more frustrated and distraught he became.  Taking the prank too far, Gollata and the other employees, who knew what Gollata had done, watched Rabon without revealing the prank to him as he frantically searched his cubicle and made several trips to his car looking

for his CAC card. In fact, the prank was not revealed to Rabon even after it became clear that he was angry (or becoming angry).

22. That after a while, Rabon began to wrongfully suspect his friend and co-worker Ricardo "Ricky" Rodriguez ("Rodriguez") of taking his CAC card. Rodriguez is approximately 35 years old and works as a Systems Administrator under Khadge. As such, when Rabon saw Rodriguez, he grabbed him by the shoulders and accused him of taking his ID. Rodriquez denied the allegation and the men engaged in a heated verbal exchange. All the while, Gollata still did not reveal the prank, needlessly allowing the two men to become aggressive with one another. Ultimately the prank was revealed to Rabon.

23. That later that day at around 2:00 p.m., Khadge entered plaintiff's office and exclaimed, "We have a problem." Khadge then went on to tell plaintiff about Gollata's prank and how Rabon had placed his hands on Rodriguez's shoulders. He also let plaintiff know that he had already sent Rodriguez home over the incident.

24. That without hesitation, plaintiff told Khadge that they needed to immediately find Rabon and interview him about the incident. However, before plaintiff and Khadge could leave plaintiff's office to find Rabon, Rabon walked into plaintiff's office to discuss the issue. After listening to Rabon's side of the story, plaintiff sent him home pending an investigation. Continuing to act with all due speed, Khadge and plaintiff then conducted their investigation that day, interviewing the following four (4) witnesses: Madeline Gollata, Austin Lahnert ("Lahnert"), Leroy Smalls ("Smalls") and Christina Boswell ("Boswell") All of these interviews were completed by 3:30 p.m. that day.

25. That the first witness to be interviewed, Gollata, was the employee who played the prank on Rabon. The remaining three witnesses (Lahnert, Smalls and Boswell) all observed some aspect of the event.

26. That in the course of the interviews (or shortly thereafter), plaintiff verbally admonished Gollata and advised Rabon and Rodriguez that their conduct was not appropriate. In the end, plaintiff decided not to formally discipline any of the employees involved in the incident. Rather, plaintiff directed the men to work out their dispute between themselves or it would be escalated to Human Resources and to Kryzda. Management also had discussions with team members regarding CAC security.

27. That thereafter, Rabon and Rodriguez (who, again, were friends) resolved their differences on their own as directed. As far as plaintiff was concerned, the matter had been concluded.

28. That plaintiff felt he handled the matter professionally and as fast as he could. Not only that, but plaintiff also handled the matter in a calm and fair manner holding those responsible accountable for their actions, but doing so in a consistent way, providing each employee with the same outcome – a verbal admonishment. In the end, plaintiff effectively fixed the problem. After all, those involved in the prank never engaged in that type of behavior again. Considering that neither plaintiff nor any other management employees were present during the incident, plaintiff felt he did all he could do as quickly as he could do it in handling the matter.

29. That then, on or about January 11, 2023 at or around 6:45 p.m. (still on the day of the CAC card prank), Cribben sent an email to plaintiff, plaintiff's boss Kryzda, and Khadge (although the salutation in the email was just to plaintiff). In the email she advised that

she was providing formal notification of her resignation from the project; that her last day of work would be January 31, 2023; and that, due to the nature of the work environment, she would be working from home for the remainder of the time she was on the project.

30. That Cribben's email did not end there. Instead, she used the opportunity to take some parting shots at her bosses by including a laundry list of garden-variety workplace frustrations aimed mostly at Khadge and plaintiff. Her issues with plaintiff included, among other things, that he pressed her too hard to disclose the reasons she was resigning (an allegation which is false) and that plaintiff told an employee, Jon Lomax, to "shut the fuck up" before a standup call (an allegation that is true but incomplete as, thereafter, plaintiff apologized to Mr. Lomax, and Mr. Lomax accepted plaintiff's apology). Cribben also referred to the identification card prank that had occurred earlier that day and alleged (falsely) that plaintiff had told five (5) employees that, if they reported the incident to Human Resources, they would lose their security clearance. Of course, as an experienced supervisor, plaintiff did nothing of the kind. Plaintiff never told any employee at CACI they would have their security clearance revoked or experience any other kind of punishment whatsoever for going to Human Resources. Cribben further concluded in her email that plaintiff "fostered an overall locker room environment." Yet, upon information and belief, no one made any gender discrimination claims against the defendant that arose on plaintiff's projects. As to Khadge, Cribben complained that he had called Gollata "sassy pants."

31. That in the same vein, Cribben's email did not mention or refer to any type of actionable discrimination or harassment, and it did not contain any allegation or wording that could be considered "protected activity" under any federal or state law. It was just a parting shot taken by an outspoken and disgruntled employee as she ran through the doors to another job.

32. That after receiving the email, defendant *did not* call upon plaintiff to get his version of the facts alleged by Cribben in her email.

33. That the next day (on or about January 12, 2023) Khadge and plaintiff were on a conference call with Kryzda. During the call, Kryzda somehow found it appropriate to tell plaintiff that Demola said he was going to fly down to Charleston and publicly execute plaintiff in relation to Cribben's email. Khadge was on the line and heard the full remark. Plaintiff was shocked at the threatening and violent language used by a high-level management employee at defendant – especially when it was made towards another CACI employee (namely plaintiff) and before anyone at defendant interviewed or got plaintiff's side of the story.

34. That as a result of the above, plaintiff then called and emailed Demola offering to talk and/or meet with him to see if he would clarify his "public execution" comment and to discuss any other issue(s) he may have had with plaintiff. However, Demola ignored both overtures, refusing to respond to either one of them or to otherwise communicate with plaintiff in any manner.

35. That approximately one week later – on or about January 19, 2023 – plaintiff was directed to speak with his immediate supervisor, Kryzda, and Robyn Newcomer ("Newcomer"), the Director of Human Resources at defendant. During the meeting (and to plaintiff's surprise), plaintiff was told he was being suspended or sent home pending an investigation the company was about to conduct regarding plaintiff. Plaintiff was not told why he was being sent home; he was not told what work rule, if any, defendant believed he violated; and plaintiff was not asked at any time before being sent home to provide his side of the story regarding any issue the company was investigating.

36. That the whole circumstance did not feel right to plaintiff. He was a good employee and had not violated any company rule or engaged in any other misconduct that would warrant being suspended and investigated. At the same time, plaintiff also could not come to terms with the "public execution" comment that Demola made about him.

37. That knowing he did not do anything wrong, combined with plaintiff's strong performance record at defendant, yet being threatened, sent home and investigated without being told why, plaintiff began to feel that he was being discriminated against due to his age. (Otherwise, defendant would have told plaintiff what work rule he allegedly violated and would have asked plaintiff for his side of the story.)

38. That as such, on or about Friday, January 20, 2023, plaintiff sent an email to Anderson and Newcomer in Human Resources and to his supervisors, Kryzda, and Demola, reporting and complaining about the company's refusal to tell him why he was being punished. Plaintiff's email also described the "public execution" comment made about him by Demola; it outlined some of plaintiff's accomplishments at defendant; and in two separate places in the brief email plaintiff reported and complained that ***he believed he was being discriminated against because of his age***. Plaintiff further alleged in the said email that Demola had fired other older employees at defendant who were close to retirement age; plaintiff identified the older employee that Demola had fired without cause and who plaintiff felt was a victim of age discrimination at defendant; plaintiff identified two (2) similarly-situated employees much younger than him who engaged in serious misconduct but were not disciplined; and plaintiff stated that he was being singled out and targeted by defendant because of his age.

39. That in sending the above January 20, 2023 email to defendant, plaintiff engaged in legally-protected activity under the ADEA.

11

40. That near the end of plaintiff's suspension, defendant called plaintiff and, without providing plaintiff with much context, they asked plaintiff a few questions about the extent of his knowledge of the prank involving Gollata and Rabon.

41. That a day or so later, by correspondence dated January 24, 2023 (just four (4) days after plaintiff engaged in protected activity) Kryzda and Demola terminated plaintiff allegedly for "violation of CACI's Standard of Ethics and Business Conduct" – an extremely vague reason which still left plaintiff in the dark as to what work rule defendant thought he violated that was so serious it warranted immediate termination without any notice or warning. Defendant never did tell plaintiff why he was fired; defendant never identified any specific work rule plaintiff allegedly violated; and defendant never asked plaintiff for his side of the story, even though defendant had at least three (3) opportunities: when defendant suspended plaintiff, during plaintiff's suspension, and when defendant fired plaintiff. In reality, defendant terminated plaintiff without warning, notice, prior discipline or cause and for false reasons or reasons that were not credible.

42. That thereafter, defendant transferred Frank Stott ("Stott") who, upon information and belief, is in his mid-fifties, into plaintiff's position. However, Stott was fired in short order after only sixty (60) days on the job. Thereafter, defendant filled plaintiff's position with a young man in his thirties (and, thus, substantially younger than plaintiff), Justin Martin – an employee plaintiff had hired and trained and who, at the time he was placed into plaintiff's prior position, had just six (6) months of managerial experience.

43. That as plaintiff asserted in his January 20, 2023 email, Demola has terminated employees in the past without cause that were close to retirement age. Specifically, in his email plaintiff referenced Bob Paczynski, who was in his early seventies, as one such

employee. In the same email plaintiff correctly pointed out that other similarly-situated employees outside of plaintiff's protected class at defendant were treated more favorably when caught engaging in the same or similar conduct that plaintiff was fired over (i.e., younger employees were treated more favorably than older employees). Finally, plaintiff is aware of an internal complaint filed by another employee at defendant alleging that Kryzda and Demola have both terminated or attempted to terminate multiple male employees over the age of fifty (50) – employees that had impeccable work records at defendant. The internal complaint identifies Robert Paczynski (in his seventies) just as plaintiff did in his complaint. It also identifies Frank Stott, John Jones and plaintiff as victims of age discrimination at defendant.

### FOR A FIRST CAUSE OF ACTION: VIOLATION OF THE ADEA TERMINATION BASED ON AGE

44. That plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 43 hereinabove as fully as if set forth verbatim.

45. That defendant is a "person" within the meaning of the ADEA, 29 U.S.C. § 630(a).

46. That defendant is in an industry that affects commerce and defendant employed twenty (20) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar years and, thus, defendant is an employer as defined by the ADEA, 29 U.S.C. § 630(b).

47. That plaintiff was born in 1971 and, thus, was well over forty (40) years of age at the time of defendant's discriminatory conduct against him. Therefore, plaintiff was in a protected class and is otherwise a covered employee under the ADEA.

48. That at all times during plaintiff's employment at defendant, plaintiff performed his job duties at a level that met defendant's legitimate performance expectations, as plaintiff was never disciplined at defendant, he always received above-satisfactory overall scores on his performance evaluations at defendant, he always met his goals and metrics, and management repeatedly complimented him on his job performance. Moreover, the defendant did not have valid reasons to fire plaintiff.

49. That despite the above, defendant fired plaintiff because of his age, all without warning, notice, cause, or prior discipline and for false reasons and/or reasons that were unworthy of credence. As such, plaintiff's wrongful termination constitutes an adverse employment action under the ADEA.

50. That after firing plaintiff, defendant ultimately replaced plaintiff with someone outside of plaintiff's protected class, namely it replaced plaintiff with a less-experienced and less-skilled employee who, upon information and belief, was in his thirties and, thus, substantially younger than plaintiff.

51. That moreover, the decision makers to plaintiff's termination have fired other older workers without cause; they routinely treat younger employees outside of plaintiff's protected class more favorably than they treated plaintiff in that they do not fire substantially younger employees who engage in the same or similar conduct that plaintiff allegedly engaged in; and other employees at defendant have made age discrimination complaints against said decision makers. That as such, defendant fired plaintiff because of plaintiff's age and, in doing so, violated the ADEA.

52. That as a direct result of the actions of the defendant, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated

with finding other work, economic injury, and plaintiff further seeks damages from the defendant in the form of reasonable attorney's fees and costs and prejudgment interest, all as authorized by the ADEA.

53. That defendant's actions as described above were undertaken intentionally, willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover liquidated damages from the defendant.

**FOR A SECOND CAUSE OF ACTION:
VIOLATION OF THE ADEA
RETAILIATION
(IN THE FORM OF TERMINATION)
29 U.S.C. § 623(d)**

54. That plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 53 hereinabove as fully as if set forth verbatim.

55. That defendant is a "person" within the meaning of the ADEA, 29 U.S.C. § 630(a).

56. That defendant is in an industry that affects commerce and defendant employed twenty (20) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar years and, thus, defendant is an employer as defined by the ADEA, 29 U.S.C. § 630(b).

57. That plaintiff was born in 1971 and, thus, was well over forty (40) years of age at the time of defendant's discriminatory conduct against him. Therefore, plaintiff was in a protected class and is otherwise a covered employee under the ADEA.

58. That as alleged above, plaintiff engaged in protected activity under the ADEA on or about January 20, 2023 when he sent an email to defendant reporting, complaining about and opposing age discrimination.

15

59. That shortly after plaintiff engaged in protective activity defendant terminated plaintiff and, therefore, plaintiff suffered an adverse employment action.

60. That in fact, defendant fired plaintiff without warning, notice, cause, or prior discipline and for false reasons or for reasons that are unworthy of credence, just four (4) days after plaintiff engaged in protected activity. As such, a causal connection exists between plaintiff's protected activity and his termination and defendant fired plaintiff in retaliation for engaging in protected activity, all of which is in violation of the ADEA retaliation provision is 29 U.S.C. § 623(d).

61. That as a direct result of the actions of the defendant, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, economic injury, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries, punitive damages, and plaintiff further seeks damages from the defendant in the form of reasonable attorney's fees and costs and prejudgment interest, all as authorized by the ADEA.

62. That defendant's actions as described above were undertaken intentionally, willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover liquidated damages from the defendant.

WHEREFORE, plaintiff prays for judgment against the defendant as follows:

(a) As to plaintiff's First Cause of Action, for such an amount of actual and special damages as the trier of fact may find, including damages for lost back and future wages, income and benefits, economic injury, as well as expenses associated with finding other work,

prejudgment interest, the costs and disbursements of this action, including plaintiff's reasonable attorney's fees, liquidated damages, and for such other and further relief as the court deems just and proper;

      (b)  As to plaintiff's Second Cause of Action, for such amount of actual and special damages as the trier of fact may find, (including lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries), liquidated damages, the costs and disbursements of this action, including reasonable attorney's fees, prejudgment interest and for such other and further relief as the court deems just and proper.

    HITCHCOCK & POTTS

By: *A. Christopher Potts*
A. Christopher Potts
Federal ID No.:  5517
222 West Coleman Blvd., Suite 124 #11
Mt. Pleasant, SC 29464
Telephone:  (843) 577-5000
Email:  cpotts@hitchcock-potts.com
***Attorneys for the Plaintiff***

Charleston, South Carolina
July 9, 2024